UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NATIONWIDE MUTUAL FIRE }
INSURANCE COMPANY, }
 }
    **Plaintiff,** }
 } Case No.: 2:16-cv-00911-RDP
v. }
 }
ANTONIO KING, }
 }
    **Defendant.**

## MEMORANDUM OPINION

This case is before the court on the Motion for Summary Judgment filed by Nationwide Mutual Fire Insurance Company ("Nationwide"). (Doc. # 56). The Motion is fully briefed, and the parties have filed evidentiary submissions. (Docs. # 57, 60, 62). After careful review, the court concludes that the Motion is due to be granted in part and denied in part.

**I.**    **Relevant Undisputed Facts**[1]

Defendant Antonio King submitted an insurance claim to Nationwide Mutual Fire Insurance Company after a fire loss to his home located at 2801 6th Court North in Bessemer, Alabama. (Doc. # 1; Doc. # 57-2 at 70). King purchased the home for approximately $45,000.00[2] in 1990 and took out a mortgage on the property at the time. (Doc. # 57-2 at 11-12). The home was titled in both King's and his mother's name. (Doc. # 57-2 at 11).

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] The record is unclear, but the purchase price was either $45,000 or $47,000. (Doc. # 57-2 at 11-12).

1

King has been employed by the City of Bessemer for over twenty four (24) years. (Doc. # 57-2 at 7-8). He has never been sued, filed for bankruptcy, or been foreclosed upon. (Doc. # 57-2 at 7-9, 79-80). King's take home pay was approximately $1,200.00 per month, and his monthly expenses exceeded $1,200.00 (Doc. # 57-2 at 7-10; Doc. # 57-9 at 17-20). King's monthly mortgage payment was approximately $380 per month. (Doc. # 57-6 at 3). King was three months behind on his mortgage payments at the time of the fire. (Doc. # 57-2 at 66). He was also two to three months behind on a payment he made on his daughter's car. (Doc. # 57-6 at 11). However, King's regular pattern was to catch up on his bills when he received his income tax refund. (Doc. # 57-9 at 25). King received a tax refund of approximately $7.000.00 at the end of January or the first of February 2016. (Doc. # 57-9 at 25-26).[3]

King was the only person who lived at 2801 16th Court North. (Doc. # 57-6 at 6-7). For the eight years prior to the fire, however, King had been the primary caretaker for his aging mother, Mary King, who was 88 years at the time of the fire. (Doc. # 57-6 at 6-7). She has since passed away. (*Id.*). As his mother's caretaker, King spent most nights at his mother's house during that time and prepared prepare her food. However, King went to his home every day after work. (Doc. # 57-6 at 6-7). He kept food and personal belongings at his mother's house. (Doc. # 57-6 at 6, 14).

On January 19, 2016, King went home after work to watch television. (Doc. # 57-6 at 4; Doc. # 57-4 at 16). King had electric heaters on in the house because it was very cold, and his gas had been shut off for a number of years. (Doc. # 57-4 at 17-19). He explained that the electric heaters were less expensive than gas. (Doc. # 57-4 at 17-19).

---

[3] King admitted that he claimed dependents on his 2014 and 2015 tax returns who had not lived with him. (Doc. # 57-2 at 91-94).

This case involves a fire that occurred in the early morning hours of January 20, 2016. (Doc. # 57-2 at 7, 17). On January 19, King left his house to help his mother with dinner. (Doc. # 57-6 at 4-5; Doc. # 57-4 at 16). At the time of the fire, he was at his mother's house where he had fallen asleep. (Doc. # 57-2 at 18-19; Doc. # 57-4 at 13-16; Doc. # 57-6 at 4-5). No one was inside his home when the fire occurred. (Doc. # 57-4 at 13). King was the last person inside the home prior to the fire and had locked the doors when he left. (Doc. # 57-4 at 13-14). He lived alone and no one else had keys to the house. (*Id.*).

King was not aware of any electrical problems with his house. (Doc. # 57-4 at 17). He denied having any flammable liquid in his living room or under the house at the time of the fire (Doc. # 57-4 at 19).

King was alerted to the fire by several phone calls from neighbors. (Doc. # 57-2 at 18; Doc. # 57-4 at 13). When King arrived at his home after learning of the fire, he was crying and upset. (Doc. # 60-11 at 45).

The Bessemer Fire Department responded to the fire. (Doc. # 57-3). According to their Fire Incident Report, the fire department received the alarm at 2:47 a.m. and arrived at 2:53 a.m. (Doc. # 57-3 at 1). When the firefighters arrived, the front and back doors to the home were locked, which required forcible entry. (Doc. # 57-3 at 6). The fire was controlled by 5:13 a.m. (Doc. # 57-3 at 1).

Steven DiChiara, a fire investigator for the City of Bessemer, attended the fire scene on January 20, 2016. (Doc. # 60-11 at 4-5, 16-17). DiChiara investigated to find out how the fire started. (Doc. # 60-11 at 50). He determined that the burning was most intense on the floor near the right-front side of the house, near the front door. (Doc. # 60-11 at 38-40). The fire burned through the floor in that area and through the front door. (Doc. # 60-11 at 38-40).

DiChiara examined the house looking for "pour patterns." (Doc. # 60-11 at 49-50). Pour patterns are a result of someone pouring an accelerant on a place where a fire occurs. (*Id.*). But, DiChiara found no evidence of an accelerant. (*Id.*). DiChiara also looked carefully to explain the hole in the floor near the front door to explain "why it burned so bad right [there]." (Doc. # 60-11 at 39-40). He believed the heat source was below the floor because "it's not going to burn through that floor, unless it's a heat source from underneath the floor." (Doc. # 60-11 at 39-40). "[F]ire burns up. Fire doesn't burn down." (Doc. # 60-11 at 38).

The Bessemer Fire Department's preliminary investigation indicated that the fire was caused by an electrical wiring malfunction originating under the floor near the right side of the front door. (Doc. # 57-3 at 3). However, the cause of ignition was marked as "under investigation" and factors contributing to ignition were described as "undetermined." (Doc. # 57-3 at 4).

Nationwide received notice of the fire on the day it occurred and immediately began its own investigation. (Doc. # 57-2 at 21-22). As part of its investigation, Nationwide conducted physical inspections of the property, received two recorded statements from King, and examined him under oath. It also conducted forensic lab testing and an examination of the premises by its own origin and cause investigator. (Docs. # 57-4 – 57-9).

The recorded interviews of King took place on January 21, 2016 and February 2, 2016. (Docs. # 57-4 and 57-6). During the January 21 interview, King reported that the house was locked when he left and no one else had keys. (Doc. # 57-4 at 13-14). During the February 2 interview, King was asked about a trace of gasoline purportedly found, but he could not explain it. (Doc. # 57- 6 at 20-22). He denied storing any gasoline inside his home (Doc. # 57-6 at 29),

4

and again confirmed that the house was locked when he left and no one else had keys. (Doc. # 57-6 at 3, 16-18, 20-22, 29).

When it receives notice of a fire claim, Nationwide sends a claims adjuster to examine the property. (Doc. # 60-4 at 37-38). If the claims examiner cannot determine the cause and origin of the fire, he will assign a cause and origin expert to conduct an examination. (Doc. # 60-4 at 38). Nationwide estimates that it retains a cause and origin expert on "99.9 percent [of fires]." (Doc. # 60-4 at 41).

Nationwide's cause and origin investigator, Michael Pate, obtained two samples from the wood floor in King's house. (Doc. # 57-5 at 2). One sample was of charred wood flooring from near the front door; the other was charred wood from the center of the living room. (*Id.*). The Laboratory Report from AK Analytical Forensic and Scientific Investigations reported that the charred wood flooring from near the front door did not reveal the presence of an identifiable ignitable liquid, but the charred wood from the center of the living room contained components identifiable as evaporated gasoline. (*Id.*).

Pate informed DiChiara that a trace of accelerant had been found near the center of the living room. (Doc. # 60-11 at 51). DiChiara asked how the accelerant got from there to the origin of the fire near the front door. (Doc. # 60-11 at 51-52). After discussion, DiChiara told Pate that he would not change his report on the cause of the fire. (Doc. # 60-11 at 51-52).

Pate's February 9, 2016 report notes that DiChiara believes the fire originated in the crawlspace under the living room floor. (Doc. # 57-7 at 3). The report notes that the fire burned from the living room through the front wall to the exterior and that the entry door fell onto the living room floor. (Doc. # 57-7 at 4). It further notes a large hole that burned through the floor in the right front corner of the living room. (Doc. # 57-7 at 5). Pate's report states that "[t]he

damage and the burnings are consistent with that caused by high heat release rate fuel that, according to [] King, should not be there." (Doc. # 57-7 at 5). Immediately following this sentence, the report states that "[a] debris sample consisting of burned wood was collected from this area and submitted for laboratory analysis. The sample tested negative for ignitable liquid residue." (Doc. # 57-7 at 5).

Pate's report further states that patterns in the center of the living room are "consistent with the burning of an ignitable liquid" and that debris from this area "tested positive for evaporated gasoline." (Doc. # 57-7 at 5). Pate eliminated a space heater found in the living room as the cause of the fire. (Doc. # 57-7 at 5). Based on his findings that the fire originated in the living room and that a sample from the middle of the room, rather than where the fire burned the strongest, tested positive for evaporated gasoline, he concluded that "the fire is incendiary in nature and was caused by the willful introduction of gasoline on the living room floor." (Doc. # 57-7 at 6). Pate did not do any independent analysis to determine the quantity or the amount of the alleged evaporated gasoline. (Doc. # 60-3 at 72). Pate merely observed the space heaters found in the living room and determined, without any further testing, that the space heaters were not the source of the fire. (Doc. # 60-3 at 80-81).

Pate does not recall how many cause and origin examinations he had performed the week before the one at King's house (Doc. # 60-3 at 59-60), but estimates that the number is three. (Doc. # 60-3 at 60). Pate acknowledged his boots had "probably not" been decontaminated between investigations. (Doc. # 60-3 at 60). He further admitted it is possible his boots had been exposed to gasoline prior to examining King's house (Doc. # 60-3 at 61), but believes that even if his boots had been exposed to gasoline at another location, the gas would have evaporated before he arrived at King's house. (Doc. # 60-3 at 60).

Nationwide made advance payments to King related to the contents of the house and for his living expenses.[4] (Doc. # 60-4 at 56-57). On February 19, 2016, Nationwide issued a reservation of rights letter to King. (Doc. # 57-8). The reservation of rights letter stated in relevant part:

> The information we received for your claim has created a few coverage questions regarding your Homeowner's policy. These questions specifically surround:
>
> - Whether the loss was accidental or caused by the insured or at the direction of an insured;
>
> - The occupancy of the home & the period of time in which it has been unoccupied;
>
> - Whether all interested parties were disclosed to us.
>
> These questions will be investigated as we process your claim.

(Doc. # 57-8 at 2).

On March 17, 2016, Nationwide examined King under oath. (Doc. # 57-8). In the examination, King explained that after his house burned down, he stayed with his mother for a while, but when Nationwide agreed to pay for a hotel for thirty-one (31) days, he moved to the hotel because he "needed [his] own space, [his] own place that [he was] used to having." (Doc. # 57-9 at 9).

On March 31, 2016, Pate returned to King's house to look at the crawl space. (Doc. # 60-3 at 95-96). He had already determined the cause of the fire at that point in time. (Doc. # 60-3 at 96). He returned to the house because he was asked to do so. (Doc. # 60-3 at 96).

At the time of the fire, King's home was covered by a homeowner's policy # 77 01HO790093 issued by Nationwide and that policy was in full force and effect,. The policy had

---

[4] In addition to expenses incurred in temporarily housing King in a hotel during the investigation, Nationwide issued payments of over $8,000.00 to King under the policy. (Doc. # 57-11). Of that amount, $7,500.00 was paid pursuant personal property coverage, approximately $500.00 to $1,000.00 was paid for additional living expenses, and $206.60 was paid related to dwelling coverage. (Doc. # 57-11; Doc. # 57-2 at 31-32).

7

coverage limits of $80,700.00 under Coverage A for the Dwelling, $8,070.00 under Coverage B for Other Structures, $56,491.00 in Coverage C for Personal Property, and $80,700.00 in Coverage D in Additional Living Expenses. (Doc. # 57-10). King was current on his premium payments. (Doc. # 60-4 at 37).

Nationwide takes the position that it has not denied King's insurance claim. (Doc. # 60-4 at 61-63). However, Nationwide stopped payments to King in approximately March 2016 because it determined that King did not "live" in the house. (*Id.* at 61-63, 69-70). Nationwide based this determination on King's statement to its investigator that, although he went by his house on a daily basis, he "stayed" with his mother. (Doc. # 60-4 at 70). When it made this determination, Nationwide was aware that King was taking care of his elderly mother. (Doc. # 60-4 at 71-72).

Nationwide resumed payments to King after he filed a complaint with the Alabama Department of Insurance. (Doc. # 60-4 at 68-69). King also obtained affidavits from five (5) of his neighbors who confirmed that he lived at 2801 6th Court North in Bessemer, Alabama. (Docs. # 60-5 - 60-9).

On June 1, 2016, Nationwide filed this declaratory judgment action against King. (Doc. # 1). King has received no payments from Nationwide since it filed this action. (Doc. # 57-2 at 69). King filed a counterclaim against Nationwide asserting breach of contract and bad faith claims and requesting his own declaratory relief. (Doc. # 18).

In its summary judgment briefing, Nationwide asserts that the following are the policy provisions relevant to this case:

**Covered causes of loss**

**Coverage A - Dwelling**
**Coverage B - Other structures**

> **We** cover accidental direct physical loss to property described in Coverages A and B except for losses excluded under Section I - Property Exclusions.
>
> **Coverage C - Personal Property**
>
> **We** cover accidental direct physical loss to property described in Coverage C caused by the following perils except for losses excluded under Section I - Property Exclusions.
>
> 1.   Fire or lightning.
>
>  …
>
> **SECTION I – PROPERTY EXCLUSIONS**
>
> 1.   **We** do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another cause of event contributed concurrently or in any sequence to cause the loss.
>
> …
>
>> g)   Intentional Acts, meaning loss resulting from an act committed by or at the direction of an **insured** that may reasonably be expected to result from such acts, or is the intended result from such acts. Intentional acts include criminal acts.  Such acts exclude coverage for all **insureds.**

(Doc. # 57 ay 9-10; Doc. # 57-10 at 17, 19).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -

- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a Plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."

*Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting affirmative evidence showing the absence of a genuine issue of material fact—that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (citation omitted).

### III. Analysis

In its Motion, Nationwide seeks summary judgment in its favor on King's counterclaims for breach of contract and bad faith, and on its own claim seeking a declaratory judgment that there is no coverage under the policy for the loss caused by the fire. Nationwide argues that it is

entitled to summary judgment on all three of these claims because it has presented substantial evidence in support of its affirmative defense of arson. Since Nationwide's declaratory judgment complaint seeks a declaration that the insurance policy issued by Nationwide does not provide coverage for King's fire claim, a determination of King's counterclaims will also determine whether Nationwide is entitled to summary judgment on its requested declaratory relief.

Nationwide also seeks summary judgment on King's claim for mental anguish damages on his breach of contract claim. (Doc. # 57). The court addresses these arguments below.

### A. King's Breach of Contract Claim

The elements of a breach of contract claim are: "(1) the existence of a valid contract binding the parties in the action, (2) [plaintiff's] own performance under that contract, (3) the defendant's nonperformance, and (4) damages." *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995) (citations omitted). There is no dispute that a valid insurance contract existed, that King made the required policy payments under that contract, and that King sustained damages. The issue is whether Nationwide's failure to pay the claim constitutes nonperformance.

Nationwide claims that coverage for the fire is excluded by the policy because King intentionally set the fire. It argues that the policy expressly excludes any loss arising out of an act committed by or at the direction of the insured with the intent to cause a loss. (Doc. # 57 at 12-17).

The insurer bears the burden of demonstrating that such an exclusion applies. *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 12 (Ala.2001) (citing F*leming v. Alabama Farm Bureau Mut. Cas. Ins. Co*., 293 Ala. 719, 310 So.2d 200, 202 (1975)). Of course, arson by an insured is an absolute defense to an action upon the policy. *See Mueller v. Hartford Ins. Co. of Ala.,* 475 So.

2d 554, 557 (Ala. 1985) (*citing Hosey v. Seibels Bruce Grp., S.C. Ins. Co.,* 363 So. 2d 751 (Ala. 1978); *Am. Fire & Cas. Co., Inc. v. Archie,* 409 So. 2d 854 (Ala. Civ. App. 1981); *Long v. Ins. Co. of N. Am.,* 670 F.2d 930 (10th Cir. 1982)); *Great Southwest Fire Ins. Co. v. Stone,* 402 So. 2d 899, 900 (Ala. 1981). But, the insurer must prove that arson was the reason for the fire. And, therefore, if King intentionally set the fire, the policy exclusion applies. Thus, the issue before the court is whether Nationwide has presented undisputed evidence on each element of its arson defense. If there is a genuine issue of material fact regarding the defense, Nationwide's motion is due to be denied – both on its declaratory judgment claim and on King's contract claim.

To establish an affirmative defense of arson, an insurer may present evidence of 1) incendiary origin of the fire, 2) motive of the insured, and 3) unexplained surrounding circumstances implicating the insured. *Stone*, 402 So. 2d at 900. The "insurer's burden of proof is not particularly heavy." *Fondren v. Allstate Ins. Co.,* 790 F.2d 1533, 1535 (11th Cir. 1986).

Nationwide has presented the testimony of an expert who opines that the fire was intentionally set, and it is undisputed that King was the only person with access to the house. Nationwide argues that it has presented evidence supporting each element of its arson defense. (Doc. # 57 at 15). The problem for Nationwide, however, is that the evidence on which it bases its motion is not undisputed. An examination of the evidence presented by both sides reveals that there is a genuine issue of material fact as to whether the cause of the fire was arson.

### 1. Incendiary Origin of the Fire

Nationwide's cause and origin investigator, Michael Pate, obtained two samples from the wood floor in King's house. (Doc. # 57-5 at 2). One sample was of charred wood flooring taken from near the front door where the fire was most intense; the other was charred wood taken from the center of the living room. (*Id.*). The charred wood flooring taken from near the front door did

not reveal the presence of an identifiable ignitable liquid. But because the charred wood taken from the center of the living room contained components identifiable as evaporated gasoline (*id.*), Nationwide's expert concluded that the fire was started by the unexplained gasoline. (*Id.*).

King denies setting the fire and also denies being home at the time the fire started. His undisputed testimony is that he was asleep at his mother's house when the fire started. (Doc. # 57-2 at 18-19; Doc. # 57-4 at 13-16; Doc. # 57-6 at 4-5). Moreover, the Bessemer Fire Department's preliminary investigation indicated that the fire was caused by an electrical wiring malfunction originating under the floor near the right side of the front door. (Doc. # 57-3 at 3). The cause of ignition was marked as "under investigation" and factors contributing to ignition were described as "undetermined." (Doc. # 57-3 at 4). Even after Pate notified DiChiara of the lab report showing a trace of gasoline on a wood sample from the middle of the room, he declined to conclude the cause of the fire was arson. DiChiara believed the heat source was below the floor because "it's not going to burn through that floor, unless it's a heat source from underneath the floor." (Doc. # 60-11 at 39-40). "[F]ire burns up. Fire doesn't burn down." (Doc. # 60-11 at 38).

Therefore, there is conflicting evidence regarding the whether the origin on the fire was incendiary in nature. This is a genuine issue of material fact which a jury must resolve.

  2. Financial Motive

Evidence of financial distress is sufficient to establish a motive for arson. *See e.g. Bush v. Ala. Farm Bureau Mut. Cas. Ins. Co., Inc.*, 576 So. 2d 175, 179 (Ala. 1991); *Fondren*, 790 F.2d at 1535. However, courts have required resolution of an arson defense by a jury in cases where the financial distress evidence was more compelling than that presented here. *See Williams v. Allstate Ins. Co.*, 591 So.2d 38 (Ala. 1991) (case submitted to a jury where the insured was in

Chapter 11 bankruptcy); *Shadwrick v. State Farm Fire & Casualty Co.*, 578 So.2d 1075, 1077 (Ala.1991) (case submitted to a jury where the insured had two mortgages on the burned house, the insurance proceeds would pay the insured's debts and leave cash in hand, and the insured had insufficient income to support her children and attend school full-time); *Bush v. Alabama Farm Bureau Mut. Casualty Ins. Co.*, 576 So.2d 175 (Ala.1991) (case submitted to a jury where the insured's "financial trouble" included three mortgages on the burned house, monthly bills equivalent to monthly income, and being sued in a lawsuit claiming $50,000 in damages); *Bryant v. State Farm Fire & Casualty Ins. Co*., 447 So.2d 181 (Ala.1984) (case submitted to a jury where insured did not make enough money to cover her debts, had two mortgages on the house, and was receiving money from her mother).

Here, King purchased a modest house, the mortgage on which he had been paying for over twenty years. Although he was three months behind on his mortgage payments, he had a plan to get current on those payments upon receipt of a tax refund. Indeed, there is evidence from King that he had in previous years caught up on past due bills using his tax refund. He received the expected tax refund of approximately $7.000.00 shortly after the fire. (Doc. # 57-9 at 25-26). King had stable, long-term employment. He paid for his daughter's car. He was the primary caretaker of his aged mother. Thus, there is ample Rule 56 evidence from which a jury could conclude that King did not have the necessary financial motive to commit arson.

3. Unexplained Surrounding Circumstances

Implausible explanations are the sort of evidence that courts have found sufficient to satisfy the strange, unexplained surrounding circumstances prong of the arson defense. *See, e.g.*, *Stone*, 402 So. 2d at 900-01 (finding that a nightclub operator had the opportunity to commit arson since he and his girlfriend were the last to leave the club prior to the fire, they locked the

doors, and left around the same time the fire started); *Crown Colony Distrib., Inc. v. U.S. Fire Ins. Co.*, 510 F.2d 544 (5th Cir. 1975) (insurer presented sufficient evidence of strange surrounding circumstances by showing insured doubled its inventory, obtained a new expensive line of jewelry, and nearly doubled its fire insurance coverage, and by showing that the manager was on the premises at the time of the arson preparations).

Here, King denies setting the fire and denies being at the house at the time the fire started. There is evidence that King used space heaters, rather than gas, to heat his home because he found their use to be less expensive. (Doc. # 57-4 at 17-19). On the night of the fire, he left to care for his mother and fell asleep at her house. The fire started while he was asleep at his mother's house. (Doc. # 57-2 at 18-19; Doc. # 57-4 at 13-16; Doc. # 57-6 at 4-5). King was the only person with access to the house and locked the doors when he left. . (Doc. # 57-4 at 13-14). One wood sample taken from the house tested positive for traces of gasoline. King had no explanation for the presence of the gasoline. However, Pate, Nationwide's expert, testified that he did not decontaminate his boots between investigations and, although he thought it was unlikely, he admitted that it was possible that there was gasoline on his boots from a prior investigation. Although the Bessemer Fire Department has not conclusively determined the cause of the fire, its investigator refused to conclude that the cause of the fire was arson.

There is sufficient conflicting evidence regarding the cause of the fire and Nationwide's detection of trace gasoline on one of the wood samples taken from the house to require resolution of those issues by a jury.

Summary judgment is an extraordinary remedy in arson cases and is precluded if a question of fact exists on any of the elements of an arson claim. *See Allstate Ins. Co. v. Jackson*, 2007 WL 3287369, at *7 (S.D. Ala. Nov. 5, 2007). Here, there is a question of fact on each

element of Nationwide's arson defense. The fact that Nationwide has produced evidence which could support an inference that King stared the fire simply means there is sufficient evidence for the issue to go to the jury. *Id*. It does not mean that there is nothing for a jury to decide. Therefore, Nationwide's motion for summary judgment on King's breach of contract claim is due to be denied.

B.     **King's Bad Faith Claim**

To prevail on a bad faith denial of benefits claim, a plaintiff must present evidence that the insurer either acted with an intent to injure or had no legitimately debatable reason to deny the claim. *Aplin v. Am. Surety Ins. Co.*, 568 So. 2d 757, 760 (Ala. 1990). A reason can be debatable based on an issue of fact or based on an issue of law. *Davis v. Cotton States Mut. Ins. Co.*, 604 So. 2d 354, 359 (Ala. 1992) (quoting *Nat'l Sec. Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)). "If any one reason for denial of coverage is at least arguable, this court need not look any further, and a claim for bad faith refusal to pay will not lie." *Weaver v. Allstate Ins. Co.*, 574 So. 2d 771, 774 (Ala. 1990).

As the Alabama Supreme Court has explained:

> In *Bowen,* supra, we set out the elements of the tort and attempted to show the plaintiff's burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."

*S & W Properties, Inc. v. Am. Motorists Ins. Co.*, 668 So. 2d 529, 531–32 (Ala. 1995), *as modified on denial of reh'g* (Aug. 18, 1995) (quoting *National Savings Life Insurance Co. v. Dutton,* 419 So.2d 1357, 1362 (Ala. 1982 "To defeat a bad faith claim, the [insurer] does not

have to show that its reason for denial was correct, only that it was arguable." *Liberty Nat'l Life Ins. Co. v. Allen*, 699 So. 2d 138, 143 (Ala. 1997).

Again, there is a question of fact with regard to the cause of the fire. Nationwide has presented some evidence from which a jury could conclude that King set the fire. But King denies that he set the fire, testified that he was not home when the fire started, and explained that he had a plan to resolve his financial issues.

King has not established that he is entitled to a directed verdict on his contract claim. Nationwide has presented sufficient evidence to create a genuine issue of material fact as to whether arson was the cause of the fire. Because there is a genuine issue of material fact about the cause of the fire, Nationwide has met its burden of showing that the reason it has not paid on King's claim is at least arguable. Therefore, Nationwide is entitled to summary judgment on King's bad faith claim.

### C. Mental Anguish Damages on a Breach of Contract Claim

As a general rule, Alabama law does not allow a plaintiff to recover damages for "mental anguish and suffering in an action for breach of a contract of insurance." *Vincent v. Blue Cross–Blue Shield of Ala., Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979). An exception to this rule exists "where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering." *Liberty Homes, Inc. v. Epperson*, 581 So. 2d 449, 454 (Ala. 1991). The Eleventh Circuit has observed that the majority of cases where Alabama courts have allowed mental anguish damages for breach of contract claims involved contract breaches that affected a residence or its habitability. *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1359 (11th Cir. 2000); *see also B & M*

*Homes, Inc. v. Hogan*, 376 So.2d 667, 672 (Ala.1979)) (Contracts that fall within this exception and allow for mental anguish damages are typically contracts relating to the home.).

A residence is the "largest single investment the average American family will make." *B & M Homes, Inc. v. Hogan*, 376 So. 2d 667, 672 (Ala. 1979). Most individuals obtain long-term mortgages to purchase residences, and most people hold a special emotional attachment to their homes. *Id.*

In *Owens v. Nationwide Property and Casualty Insurance Company*, Plaintiffs' home was damaged in the April 27, 2011 tornado that struck Tuscaloosa, Alabama. 2014 WL 4258084, at *1 (N.D. Ala. Aug. 26, 2014). Plaintiffs insured their home with Nationwide, and after the storm, they filed a claim with Nationwide. *Id.* Nationwide's claims adjuster recommended a certain contractor to perform repairs to Plaintiffs' home. *Id.*, at *2. At Nationwide's urging, Plaintiffs hired the recommended contractor. *Id.* Nationwide paid for certain work by issuing a check made out jointly to the contractor and Plaintiffs. *Id.* Plaintiffs were dissatisfied with the contractor's work and ultimately had to pay another contractor to repair their home. *Id.* Plaintiffs ultimately filed an action against Nationwide seeking compensatory damages for their economic loss, emotional distress, mental anguish, and punitive damages. *Id.* Nationwide moved for summary judgment. *Id.* The Honorable L. Scott Coogler denied Nationwide's motion on Plaintiffs' breach of contract claim and allowed Plaintiffs to pursue mental anguish damages on that claim. *Id.* at *5. As Judge Coogler held, "because the contract at issue relates to the home and is the type of contract where mental anguish damages can be obtained for breach, and the Plaintiffs have put forth evidence concerning mental anguish suffered as a result of the breach of contract, a reasonable jury could also return a verdict giving the Plaintiffs mental anguish damages." *Id.* This reasoning is persuasive.

Here, King had owned his home for over twenty years. He was current on his payments to Nationwide for insurance protecting that home. While he was taking care of his aging mother and staying at her house to accomplish that task, King's house burned. Nationwide not only has not paid to repair the home, it has accused King of intentionally setting the fire. The court has no hesitation in concluding that the alleged breach of contract in this case could reasonably cause mental anguish. Accordingly, if King is able to convince a jury that Nationwide breached the insurance contract, he will be permitted to request mental anguish damages.

## IV. Conclusion

For all of these reasons, the court concludes that Nationwide's Motion for Summary Judgment (Doc. # 56) is due to be granted in art and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this January 14, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE